### STATE OF CONNECTICUT *v.* TROY LEWIS
### (AC 18635)

Foti, Zarella and Healey, Js.

Argued June 8—officially released October 3, 2000

*Pamela S. Nagy*, assistant public defender, with whom, on the brief, were *Christy Doyle* and *Kerry Robair*, certified legal interns, for the appellant (defendant).

*Susann E. Gill*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Linda N. Howe*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The defendant, Troy Lewis, appeals from the judgment of conviction, rendered after a jury trial, of three counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4)[1] and one count of

---

[1] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a

conspiracy to commit robbery in violation of General Statutes § 53a-48.[2] These charges stem from three separate incidents that resulted in three informations, which the trial court consolidated for trial. On appeal the defendant claims that the trial court improperly (1) consolidated the three cases against him thus depriving him of a fair trial, (2) refused to dismiss the charges against him because his arrest was without probable cause and in violation of his constitutional rights, (3) admitted his police statement because there was no waiver of his *Miranda*[3] rights and his statement was not voluntary and (4) refused to grant a mistrial after playing back highly prejudicial testimony to the jury beyond that which was requested by the jury during their deliberations, thus denying him a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The three robberies involved were committed in Stratford between December 24, 1996, and January 4, 1997. On December 24, 1996, at about 2:15 a.m., Ramona Hemon was working as a night auditor at the Ramada Inn in Stratford. At that time, Hemon was in the lobby area with Howard Unger, the building's security guard.[4] A man came in and asked about the price of a room. After Hemon gave him that information, the man left explaining that he had to check with his girlfriend.

Shortly thereafter, two black men wearing ski masks entered the hotel and ran up to the counter behind

weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

[2] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] Hemon's seven year old son was asleep on one of the couches in the lobby.

which Hemon stood.[5] The men jumped over the counter, one man placed a shotgun against Hemon's chest, and the other was holding a baseball bat. The man with the bat used it to club Unger, who lost consciousness briefly.

One of the masked men asked Hemon where the safe was, to which she replied that there was none. He then asked where the cash drawer was, and she showed him. After the man pulled the cash drawer out, he jumped back over the counter. As both men were exiting toward the front door, one of them turned to Hemon and told her that if she moved he would blow her brains out. Then both men fled taking about $250 with them. After they had gone, Hemon's son noticed a duffel bag directly in front of the counter. Hemon was certain that it had not been there before the two masked men entered the hotel.

On December 30, 1996, Maria Guerra was working as the general manager at the Howard Johnson Motel in Stratford. Stanley Colten, a security guard, was working with Guerra that night. At about 11:30 p.m., a man came in and inquired of Guerra about the price of a room. When Guerra told him the cost, the man said that it was too expensive and left.[6]

A few minutes later, two men in long coats and masks entered the motel. Guerra testified that one of the men was the man who had come in earlier and inquired about a room. One of the men had a shotgun and yelled for Colten to get down on the floor. He then hit Colten on the side of the head with the shotgun, knocking him out for a few moments. When Colten came to, he heard

[5] Because both men wore ski masks, Hemon only saw their eyes and not their entire faces.

[6] At the trial, Guerra identified the man as the person shown in state's exhibit twenty, which was described later in the trial as a photograph of Lydell Jefferson.

the men yelling at Guerra to give them the money. Guerra testified that the man with the shotgun put it to her neck and said, "Bitch, open the register or we're gonna blow your head off." Guerra had difficulty opening the register as it was going through the day's audits and temporarily would not open. When she did get it open, she threw it at the men. One of the men put the register in a duffel bag and they both ran out. The register contained about $430.

On January 4, 1997, John Walker and Penelope Porteous were working at Krauszer's convenience store in Stratford. At about 11 p.m., Walker went to the front door of the store to lock it for the night. While doing so, Walker saw a man with a shotgun standing outside the store. That man told Walker to let him in or he would "blast" him. While Walker was trying to comply, another man ran up to Walker and started punching and choking him as well as banging his head against the glass door.[7] At the time of trial, Walker identified the defendant as the man who had assaulted him.[8]

During the attack on January 4, Porteous was in the back room counting the money in the cash drawer. Upon hearing Walker yell, she looked out and saw the scuffle. When she tried to dial 911, one of the men ran back and prevented her from doing so. They took about $55 from the cash drawer and Porteous' wallet.

The Stratford police, with the assistance of the Federal Bureau of Investigation, were able to trace to Judith Lichtenberger the social security number written in ink in the interior section of the duffel bag left at the scene of the Ramada Inn robbery. At trial, Lichtenberger identified the duffel bag as hers and testified that it had

[7] Neither of the two assailants was wearing masks, yet they told both Walker and Porteous not to look at their faces.

[8] Shortly after this robbery, Walker, working with a police artist, helped create a composite sketch of the man who assaulted him.

been kept in her garage at her home on Holland Street in Bridgeport. She also testified that she rarely stayed at the Holland Street address, but rather chose to live with her mother in Stratford. She did, however, say that her eighteen year old son, Ryan Simmons, and her sixteen year old daughter, Emily Minor, lived at the Holland Street address. In addition, Lichtenberger said that the defendant had been her daughter's boyfriend during the fall of 1996, and that her daughter had worked at Krauszer's for a brief time during this period.

Minor, who testified for the state, confirmed that the defendant had been her boyfriend in the fall of 1996, and that she had worked briefly at Krauszer's. She also testified that the defendant had stored a sawed-off shotgun at her house in late November or early December, 1996, and that it had been concealed in the same duffel bag found at the scene of the Ramada Inn robbery. In addition, she also testified that the defendant had told her that he and his friend "Dell" had committed the Krauszer robbery.

On January 29, 1997, at about 6:45 p.m., the defendant and Lydell Jefferson were arrested on warrants for an unrelated robbery in Naugatuck and both were then taken to the Stratford police department. There, after being informed of his rights and signing a written waiver of rights form, the defendant agreed to talk to the police. Thereafter, he gave a signed sworn statement in which he admitted his participation in the Ramada Inn, Howard Johnson and Krauszer robberies.[9] He also admitted that he had planned and carried out all three robberies with Jefferson and Shane Barnes. The cases were consolidated and went to trial. The defendant was con-

---

[9] The defendant testified on his own behalf at the trial. At that time, he denied giving a statement to the police and denied that the statement and rights form contained his signature and initials. He also raised an alibi defense, maintaining that he had been with his fiance, Janice McDuffie, at the time of all three robberies. McDuffie corroborated the defendant's alibi.

victed on all charges against him. This appeal followed. Additional facts will be discussed where necessary.

I

The defendant claims that the trial court improperly granted the state's motion to consolidate the three cases. Specifically, he claims that joinder of these cases was improper because (1) it allowed the jury to aggregate the evidence from all three incidents to convict him of all the charges, (2) the cases were factually similar but legally unconnected, (3) the allegations of the violent attacks in each of the three cases fatally prejudiced his right to a fair trial and (4) the prejudice caused by the improper joinder was not cured by the court's instruction. We disagree.

Prior to the trial, the state filed a motion to consolidate the three cases. The trial court held a hearing on the issue of joinder and granted the motion. "General Statutes § 54-57[10] and Practice Book § [41-19 (formerly § 829)][11] expressly authorize a trial court to order a defendant to be tried jointly on charges arising separately. In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice and that any resulting prejudice was beyond the curative power of the court's instructions. . . . [W]hether a joint trial will be substantially prejudicial to the rights of the defendant . . . means

---

[10] General Statutes § 54-57 provides: "Whenever two or more cases are pending at the same time against the same party in the same court for offenses of the same character, counts for such offenses may be joined in one information unless the court orders otherwise."

[11] Practice Book § 41-19 provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together."

something more than that a joint trial will be less advantageous to the defendant. . . .

"We recognize that an improper joinder may expose a defendant to potential prejudice for three reasons. First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all. . . . Nevertheless, because joinder foster[s] economy and expedition of judicial administration . . . we consistently have recognized a clear presumption in favor of joinder and against severance . . . and, therefore, absent an abuse of discretion, we will not second guess the considered judgment of the trial court as to the joinder or severance of two or more charges.

"The court's discretion regarding joinder, however, is not unlimited; rather, that discretion must be exercised in a manner consistent with the defendant's right to a fair trial. Consequently, we have identified several factors that a trial court should consider in deciding whether a severance may be necessary to avoid undue prejudice resulting from consolidation of multiple charges for trial. These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the

defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Delgado*, 243 Conn. 523, 531–33, 707 A.2d 1 (1998); *State* v. *Boscarino*, 204 Conn. 714, 722–25, 529 A.2d 1260 (1987).

The defendant, in arguing against joinder, claims that the three cases, while factually similar, were legally unconnected. Upon application of the factors enumerated in *Boscarino* to the present case, however, we are persuaded that the court was not required to sever the trial.

First, each of the three cases had discrete, easily distinguishable factual scenarios. As the state points out, the incidents took place on different dates, at different locations and involved different victims. Furthermore, the state presented the evidence in a manner unique to each case to avoid "spilling over" of the evidence as much as possible. The state began by presenting the circumstances of the Ramada Inn robbery. It presented the testimony of the victims of that robbery, Hemon and Unger. That evidence was followed by the testimony of Guerra and Colten regarding the circumstances of the Howard Johnson robbery. Following that, the state presented the testimony of Walker and Porteous regarding the third robbery at Krauszer's. Then, after presenting the evidence as to the circumstances of each robbery, the state presented police witnesses who testified about how the duffel bag left at the scene of the Ramada Inn robbery led them to Minor, which ultimately resulted in the ascertainment of the defendant's involvement in these robberies. "Where the state's orderly presentation of evidence has prevented confusion of the jury and has enabled the jurors to consider the evidence relevant to each offense sepa-

rately and distinctly, we will not conclude that the trial court has manifestly abused its discretion in denying the defendant's motion for severance." (Internal quotation marks omitted.) *State* v. *Marsala*, 43 Conn. App. 527, 534–35, 684 A.2d 1199 (1996), cert. denied, 239 Conn. 957, 688 A.2d 329 (1997).

Furthermore, regarding the defendant's argument that the three cases were not legally connected, while the robberies may not be considered signature crimes, all three were of that degree of similarity that the evidence could reasonably give rise to an inference that the participants were the same persons. The evidence of the duffel bag left at the Ramada Inn is significant, not only as to its part in the first robbery, but particularly as to how it supported both Lichtenberger and Minor's testimony implicating the defendant in the three robberies, in that it supplied not only a factual connection in the three cases, but vital legal connections in these cases. It was reasonable, therefore, for the court to conclude that the three cases presented discrete and easily distinguishable factual scenarios.

Second, we consider the defendant's claims that the allegations of the violent attacks in each of the three cases were so brutal and shocking that the court abused its discretion in consolidating the cases. "*State* v. *Jennings*, [216 Conn. 647, 583 A.2d 915 (1990)], cites both *Boscarino* and [*State* v. *Herring*, 210 Conn. 78, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989)], to reiterate that when both crimes charged can be characterized as violent, the test becomes whether the facts of one are 'so brutal or shocking' as to amount to prejudice if tried together." *State* v. *Stevenson*, 43 Conn. App. 680, 690, 686 A.2d 500 (1996), cert. denied, 240 Conn. 920, 692 A.2d 817 (1997).

In the first robbery, the assailant beat the victim with a baseball bat. In the second robbery, the assailant

beat the victim with the butt of a shotgun. In the third robbery, one of the assailants beat the victim with his fist and banged his head against a glass door. Hence, the factual scenarios of each of the three cases involved similar acts of violence. Therefore, it is reasonable for the court to conclude that no one incident was so brutal or shocking as to amount to prejudice if tried together.

In claiming that joinder was improper, the defendant places great weight on *State* v. *Horne*, 215 Conn. 538, 577 A.2d 694 (1990). In *Horne*, the defendant was charged in four separate informations involving incidents in four retail stores. In three of them, he was charged with robbery in the first degree in violation of § 53a-134 (a) (4). Id., 542. With reference to the fourth information, he was charged with robbery in the first degree in violation of § 53a-134 (a) (4), sexual assault in the first degree in violation of General Statutes § 53a-70 and sexual assault in the first degree with a deadly weapon in violation of General Statutes § 53a-70a.[12] Id. In the first three incidents, the defendant threatened each victim with a gun and robbed each victim. Id., 540–41. As to the fourth incident, after robbing that victim, the defendant also forced her to lie face down on the floor, pulled her slacks and underpants off and sexually assaulted her while holding her by the neck. Id., 542. The court denied the defendant's pretrial motion to sever the fourth information from the other three cases and also denied the defendant's motion to that effect made later in the trial. Id., 543. In addition, although the defendant asked the court to give a preliminary instruction because of the risk of confusion between the cases, it ultimately failed to do so. The court, over the defendant's objection, ordered all four cases joined

[12] In *Horne*, after the verdict, the trial court dismissed the count alleging sexual assault in the first degree in violation of § 53a-70. *State* v. *Horne*, supra, 215 Conn. 543.

for trial. After a consolidated trial, the jury found the defendant guilty on all counts. Id.

On appeal to our Supreme Court, the defendant argued that "he was prejudiced because the jury, faced with the evidence of factually similar but legally unrelated cases, probably commingled the evidence in one case with another and was probably inflamed by the brutal and shocking sexual assault of one of the victims." Id., 544. He also argued that the court's one time jury instruction, during its final instructions, did not mitigate the prejudice claimed. Our Supreme Court agreed and reversed all the convictions. Id., 545–46. We do point out, however, that in doing so, our Supreme Court in *Horne* indicated that on the retrial, the court, in the careful exercise of its discretion might consolidate the three robberies that did not involve the sexual assault if it issued "adequate instructions to the jury, at the beginning and during the course of the proceedings . . . to keep the facts of each robbery separate, thereby minimizing the risk that the jury would commingle the facts." Id., 553.

In the present case, in contrast to *Horne*, the court did, in our view, give such instructions at the beginning and during the course of the proceedings. Moreover, as we have pointed out, we believe, again in contrast to *Horne*, that the three robberies in this case were legally connected. Furthermore, the court's timely and specific instructions to keep the cases separate mitigated the possibility that the jury would cumulate all the evidence and convict the defendant on the theory that he was a bad person. Also, *Horne* is different from this case in that the sexual assault in *Horne* was carried out with brutality and committed under " 'very, very traumatic circumstances . . . .' " Id., 550.[13] That aspect

[13] In expressing its view of the sexual assault in *Horne*, the Supreme Court stated: "Short of homicide, [sexual assault] is the ultimate violation of self." (Internal quotation marks omitted.) *State* v. *Horne*, supra, 215 Conn. 550, quoting *State* v. *Havican*, 213 Conn. 593, 599 n.3, 569 A.2d 1089 (1990).

of *Horne* weighed heavily with our Supreme Court. See id., 552. In the present case, all three crimes involved similar acts of violence. Therefore, the facts of one crime cannot be considered so brutal or shocking as compared to the others.

Third, in considering the duration and complexity of the trial, there was no reason for the court to sever the cases for trial. The state's case took only four days to present. The evidence was not complex and was presented in an orderly and logical fashion. The defense case took one day, followed by a short rebuttal. In *State v. Herring*, supra, 210 Conn. 97, a double murder case that took eight days to try and involved testimony from twenty-three witnesses, the court concluded that neither the duration of the trial nor its complexity created a sufficient risk of confusion to require severance. In *State v. Delgado*, supra, 243 Conn. 536, a case involving a trial on first degree manslaughter and risk of injury to a child, the trial consumed eleven days and involved testimony from twenty-five witnesses. The court concluded that it was not too lengthy or complex so as to present a likelihood of jury confusion. Id., 536–37.

As pointed out, the defendant bears a heavy burden in showing that the denial of severance resulted in substantial injustice and that any resulting prejudice was beyond the curative power of the trial court's instructions. See id., 531; *State v. Herring*, supra, 210 Conn. 94–95; *State v. Boscarino* supra, 204 Conn. 721.

Furthermore, even if the defendant's conduct could be fairly seen as brutal or shocking, we must still decide whether the court's jury instruction cured any prejudice that might have occurred. "[A]lthough a curative instruction is not inevitably sufficient to overcome the prejudicial impact of [inadmissible other crimes] evidence . . . where the likelihood of prejudice is not overwhelming, such curative instructions may tip the

balance in favor of a finding that the defendant's right to a fair trial has been preserved." (Internal quotation marks omitted.) *State* v. *Hermann*, 38 Conn. App. 56, 63–64, 658 A.2d 148, cert. denied, 235 Conn. 903, 665 A.2d 904 (1995). "Barring contrary evidence, we must presume that juries follow the instructions given them by the trial judge." (Internal quotation marks omitted.) *State* v. *Radzvilowicz*, 47 Conn. App. 1, 32, 703 A.2d 767, cert. denied, 243 Conn. 955, 704 A.2d 806 (1997); 1 B. Holden & J. Daly, Connecticut Evidence (1988) § 35, p. 155.

The trial court instructed the jury on two occasions to consider the evidence separately as it related to each count.[14] The instructions came after the jury was sworn in and before the evidence began, as well as during the court's final jury instruction.[15] In *State* v. *Herring*, supra,

[14] "Now, as I indicated, this is a four count information, and while the matters are being tried at the same time, they are separate, the first three counts, the first three charges of robbery are separate incidents, and they are—that are being presented.

"Now, when you listen to the testimony you may recognize that some of the testimony will overlap one incident to the other or have some relationship, that's up to you to determine, and it may relate to all three matters in some respects. But, each must be taken on its own. In other words, the evidence that you consider as to each of the charges should be separated in your minds when you are deliberating on them.

"And, if you were to find, let's say for an example, that the state was successful in proving the defendant's guilt on one or more of these charges, that cannot in and of itself be used as a reason to find him guilty on the others if the evidence on another charge is not sufficient to satisfy the burden of proof beyond a reasonable doubt. In other words, each charge stands or falls on its own and I, of course, ask you to keep that in mind.

"The simple reason why they're tried together is really for judicial economy purposes because some of the same witnesses will be involved in the presentation of each of the cases."

[15] "This is a four count information which has been prepared by the state's attorney's office and has been read to you before. And I remind you again that while these matters are being tried at the same trial, they are separate incidents that are being presented.

"While some of the testimony may have overlapped and would relate to all of them in certain respects, each must be taken on its own. In other words, the evidence that you consider as to each of the charges should be

210 Conn. 97, the court concluded that "[w]hile any murder involves violent and upsetting circumstances, it would be unrealistic to assume that any and all such deaths would inevitably be so 'brutal and shocking' that a jury, with proper instructions to treat each killing separately, would necessarily be prejudiced by a joint trial." Therefore, we conclude that the court gave adequate jury instructions so as to avoid confusion. We conclude, therefore, that the defendant has failed to meet his heavy burden of demonstrating that the court manifestly abused its discretion in ordering the joinder of these three cases so as to result in substantial injustice and the denial of a fair trial.

## II

Before the presentation of evidence, the trial court held a hearing on certain pretrial motions filed by the defendant. He filed a motion to dismiss and a motion to suppress his statement to the police.[16] The court denied both motions. The defendant claims on appeal that the court improperly denied his motion to dismiss and improperly denied his motion to suppress.[17] We disagree.

separated in your minds when you are deliberating on them. And if you were to find, let's say for an example, that the state was successful in proving the defendant's guilt on one or more of these charges, that cannot, in and of itself, be used as a reason to find him guilty on the others if the evidence on any other charge is not sufficient to satisfy the burden of proof beyond a reasonable doubt. In other words, they stand or fall on their own, and I ask you to keep that in mind.

"The reason they're tried together is really for judicial economy purposes and because some of the same witnesses were involved in the presentation of each of the cases."

[16] Regarding the motion to suppress his statement, the court held a hearing in which evidence was produced.

[17] On appeal regarding the motion to suppress, the defendant claims that the trial court's denial was improper because (1) he did not voluntarily and intelligently waive his *Miranda* rights and (2) he did not voluntarily give his statement to the police.

The following additional facts are relevant. On January 29, 1997, at approximately 6:45 p.m., Thaddeus Walewski of the Stratford police department[18] received direction from the police dispatcher to investigate a suspicious car with two occupants on Seymour Street.[19] At this time of the evening, most of the businesses in the area were closed and there were no other cars on the street. The police department had dispatched Walewski to Seymour Street after receiving an anonymous[20] call from a person who was working in a building on that street. The dispatcher told Walewski that the caller felt that the car "was out of place" as it was parked in a business area and it was suspicious because it had two occupants.

Upon arriving at Seymour Street, Walewski parked his patrol car behind the suspicious vehicle. He was alone[21] and did not have his flashing lights on. He exited his patrol car carrying his flashlight. He approached the suspicious vehicle, tapped on the window and asked what they were doing there. The driver, Jefferson, told Walewski that the car was broken down and that they were waiting for assistance. Walewski then asked Jefferson for some identification. He said that he did not have any and then started to put his hand in his pocket, at which time Walewski told him to take his hand out of his pocket because he felt that if Jefferson did not have any identification there was no need for him to go into his pocket.[22] Walewski then asked Jefferson

---

[18] At the time, Walewski was a twelve year veteran of the police department.

[19] Seymour Street is in a business district.

[20] The anonymous caller did not recognize this car as belonging to the caller's business or any businesses there.

[21] Stratford Police Officer Albert Peurea had also been dispatched to Seymour Street and he arrived shortly after Walewski. Two cars are always dispatched to calls received by the Stratford police department.

[22] To the surprise of Walewski, instead of placing both hands on his lap, Jefferson placed both hands on the steering wheel.

his name, and Jefferson responded honestly. Walewski recognized Jefferson as someone wanted on a Naugatuck warrant. Walewski, after verifying that he had the right person for the Naugatuck warrant, arrested Jefferson.

While Walewski was addressing Jefferson, Officer Albert Peurea, a nine year veteran of the Stratford police department, drove up in his patrol car.[23] Peurea walked to the front passenger window and asked the passenger, the defendant, his name, to which he responded, "Troy Brazel." When Peurea asked him for some identification, he could not produce any and Peurea had him exit the car. Peurea, after seeing Jefferson get arrested, patted the defendant down for safety reasons.

At the time the passenger exited the car, both Walewski and Peurea knew there was a Naugatuck warrant out for a "Mr. Lewis" from a flyer issued by Naugatuck police, but they did not specifically know that the passenger was Troy Lewis. Not only because the passenger was with Jefferson, but also because he fit the general description they had of Lewis, Walewski suspected that he was possibly the other person wanted on the Naugatuck warrant. At that time, the defendant was standing outside the car and was not handcuffed. Because Jefferson was wanted for robbery, the officers were not going to let them walk freely back to the car, fearing that there could have been weapons there. Peurea then placed the defendant in the patrol car until he or Walewski could ascertain his identity.

Shortly thereafter, Detective Richard Yoemans of the Stratford police department arrived at the scene. Yoemans checked the Naugatuck warrants and positively identified the defendant as Troy Lewis. The defendant admitted his true identity, was arrested, handcuffed and brought to Stratford police headquarters.

[23] Peurea was also dispatched to the scene.

Upon their arrival at police headquarters, Peurea read the defendant his *Miranda* rights, including a waiver of those rights, from a police department issued *Miranda* form. Peurea made sure that the defendant understood them, had him initial each of the five individual rights and then had him sign his signature at the bottom. Peurea read the defendant his rights, and the defendant read them for himself. During this process, Peurea asked the defendant if he had any questions and he did not.

After Yoemans returned to police headquarters, he interviewed Jefferson. Jefferson gave Yoemans a written statement. Thereafter, Yoemans, who knew Peurea had already given the defendant his *Miranda* rights, began interviewing the defendant. In doing so, Yoemans told the defendant that Jefferson had implicated him in the Stratford robberies. He also showed the defendant the duffel bag recovered from the Ramada Inn robbery as well as a composite sketch that the police artist had made from a description by Walker, a victim in the Krauszer's robbery. A few minutes after Yoemans began interviewing the defendant, the defendant willingly gave Yoemans a statement as to his involvement in the three Stratford robberies.[24] When the defendant finished giving his statement,[25] Yoemans gave him a copy of it to let him read.[26] Furthermore, the defendant was not threatened or promised anything for giving the statement and he did not appear to be under the

---

[24] As to the method of taking the statement, it was taken on a computer word processor with Yoemans sitting in front of it and the defendant sitting to his left. As the defendant told Yoemans what he wanted to put in the statement, Yoemans typed it.

[25] Detective John Cratty of the Stratford police department, who was present throughout the taking of the statement, acted as a witness to the defendant's signing and acknowledging the statement. Lieutenant Thomas Rodia of the Stratford police department administered the oath to the defendant acknowledging his statement.

[26] The defendant did not make any changes in his statement after he read it.

influence of alcohol or drugs or emotionally upset at the time. Thereafter, the defendant was charged with three counts of robbery and one count of conspiracy to commit robbery.

Prior to trial, the defendant filed a motion to suppress his statement because, as he claims on appeal, it was not voluntarily given and he did not validly waive his *Miranda* rights. The court denied that motion. Furthermore, the defendant filed a motion to dismiss the case because the officers were without a reasonable and articulable suspicion of criminal activity to detain the defendant. The court also denied that motion. The court found that the police had a right to investigate complaints of suspicious cars being in a neighborhood, at a time in which cars are not normally seen there and in a location in which cars are not normally parked. It further found that such right to inquire led the police to determine that one of the two passengers, Jefferson, was in fact a person wanted on a robbery warrant by the Naugatuck police. As to the defendant, the court found that the police could not properly identify him and they had a right to detain him for the purpose of learning his identity. It stated that it would be a "sad state" if police would be so thwarted in their ability to investigate into someone's identity, especially, as here, when one of the individuals was indeed wanted by the police and the other person was unable to present any identification at all. In addition, the court found that the defendant's arrest was made properly and probable cause had been determined in the Naugatuck warrant. It also determined that the interrogation of the defendant took place after he was legally in custody and after he voluntarily waived his *Miranda* rights. Furthermore, it found that the police made no threatening gestures, used no coercive measures, made no promises and did not deceive the defendant into making his police statement.

## A

The defendant first claims that there was no reasonable and articulable suspicion for the police to have detained him and no probable cause to arrest and, because his federal and state constitutional rights were violated, the charges against him should have been dismissed. We disagree.

"Under both the federal and state constitutions, police may detain an individual for investigative purposes if there is a reasonable and articulable suspicion that the individual is engaged or about to engage in criminal activity. . . . Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . The police officer's decision . . . must be based on more than hunch or speculation. . . . In justifying the particular intrusion, [t]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that [intrusion]. . . . Once a reasonable and articulable suspicion exists, the detaining officer may conduct an investigative stop of the suspect to confirm or dispel his suspicions . . . .

"The determination of whether a reasonable and articulable suspicion exists involves a two-part analysis: (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts gave rise to such a suspicion is legally correct. . . . The trial court's conclusions must stand unless they are legally and logically inconsistent with the facts." (Citations omitted; internal quotation marks omitted.) *State* v. *DaEria*, 51 Conn. App. 149, 154–55, 721 A.2d 539 (1998).

"Article first, §§ 7 and 9 of our state constitution permit a police officer in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes even though there is no probable cause to make an arrest. . . . In determining whether the detention was justified in a given case, a court must consider if [b]ased upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity. . . . A court reviewing the legality of a stop must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . These standards, which mirror those set forth by the United States Supreme Court in *Terry* v. *Ohio*, [392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], with regard to fourth amendment analysis, govern the legality of investigatory detentions under article first, §§ 7 and 9 of our state constitution." (Citations omitted; internal quotation marks omitted.) *State* v. *Lipscomb*, 58 Conn. App. 267, 271–72, 753 A.2d 415 (2000).

Our Supreme Court has determined that "article first, §§ 7 and 9 of the Connecticut constitution afford[s] greater protection to the citizens of this state than does the federal constitution in the determination of what constitutes a seizure." (Internal quotation marks omitted.) *State* v. *Donahue*, 251 Conn. 636, 645, 742 A.2d 775 (1999). "Police have the right to stop for investigation short of arrest where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot. . . . [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . [A] police officer's decision to detain an individual for investigatory purposes must be predi-

cated on more than a mere hunch. . . . An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Lipscomb*, supra, 58 Conn. App. 272–73.

In his reply brief, and at oral argument before this court, the defendant argues that our Supreme Court's recent decision in *State* v. *Donahue*, supra, 251 Conn. 636, is squarely on point and requires that this court conclude that Walewski did not have a reasonable and articulable suspicion to stop and detain the defendant.

In *Donahue*, a state police officer was on routine patrol at 1:50 a.m. on December 10, 1997, in Windham. Specifically, he was patrolling a cemetery next to a public housing project where drug dealing and prostitution often took place. As he was leaving the cemetery, he noticed a car turn abruptly into a vacant parking lot of a social club that had closed for the evening. Id., 639. The defendant had a passenger in the car. The officer drove his car across the street toward the defendant's car. When he entered the parking lot of the social club, the officer made a U-turn so that he could pull his car behind the defendant's car, which was facing the exit of that lot. Id., 640. The officer activated his overhead flashing lights when he pulled up behind the defendant. Id.

Before exiting his car, the officer radioed the defendant's license number to the police barracks and learned that the car was not stolen and that there were no outstanding warrants. The officer approached the defendant's car and asked him for his license and registration. The defendant rolled down his window when he saw the officer. At that point, the officer detected alcohol on the defendant's breath, and after the defendant failed a sobriety test, the officer arrested the defen-

dant for operating a motor vehicle while under the influence of intoxicating liquor. Id.

At his trial, the defendant moved to suppress evidence obtained after his initial detention on the ground that the detention had been unlawful. He claimed that the officer lacked a reasonable and articulable suspicion to stop his vehicle and that he was denied his federal and state constitutional rights. That motion was denied and the defendant appealed. Id., 640–41. Our Supreme Court found that the police officer's "detention of the defendant was based on nothing more than the location of the defendant's vehicle at an early hour in the morning." Id., 645.

The present case, however, is readily distinguishable from *Donahue*. First, in *Donahue*, the police officer pulled behind the car and activated his overhead flashing lights, thereby showing a sign of authority over the defendant. Our Supreme Court concluded that it would not disturb the trial court's conclusion that pulling the patrol car behind the defendant and activating the overhead flashing lights would cause any reasonable person to feel as though they were not free to leave; therefore, at that point, he was considered seized. Id., 643. In the present case, Walewski was responding to a call from the dispatcher telling him to investigate a suspicious car with two individuals inside. He pulled up behind the car the defendant was in, but did *not* activate his overhead flashing lights. Once he pulled up behind the car, which contained two people, he exited his patrol car carrying his flashlight. He then proceeded to ask the driver, Jefferson, what he was doing there and for some identification. Because he was dispatched to a scene with what was described as a suspicious car, a short inquiry of the driver was completely reasonable behavior by Walewski. Applying *Donahue* to this case, we conclude that a seizure had not occurred. When Walewski asked, the driver told him his name was Lydell

Jefferson. Walewski recognized his name as possibly being a man wanted on a Naugatuck warrant in connection with a robbery. This would certainly constitute a reasonable and articulable suspicion.

Second, in *Donahue,* the police officer just happened to be in the neighborhood and saw a car in a high crime area and decided to investigate. In the present case, the officer was dispatched to the scene. The dispatcher relayed a telephone call from someone working in a building on Seymour Street who said that there was a suspicious car outside. The caller described the location of the car, the time the car was parked there and that there were two occupants inside. Walewski was, in effect, following a directive, as was his duty, from the police dispatcher. When he arrived, he saw the car that the caller described and decided to investigate.

Third, in *Donahue,* our Supreme court stated that "[t]he state's argument [that the officer's stop of the defendant was not a seizure] is difficult to sustain *in light of its counsel's concession,* at oral argument before this court, that under the circumstances in the present case, he—or any other reasonable person—would not have felt free to leave after [the officer] pulled up behind the defendant's car and activated the vehicle's overhead flashing lights." (Emphasis added.) Id., 643. Here, the state made no concessions.

Fourth, in *Donahue,* the state argued five factors[27] as to why the officer had a reasonable suspicion to pull

---

[27] In *Donahue,* "the state argue[d] that the following five factors produced a reasonable suspicion that the defendant was engaged or about to engage in criminal activity: (1) he was driving in a deserted area late at night; (2) he made an abrupt turn into the parking lot; (3) he pulled into an empty, unlit parking lot of an establishment that had closed for the evening; (4) his vehicle was in an area that had experienced a rise in criminal activity; and (5) his behavior was 'consistent with the type of behavior that often preceded the criminal activity [the officer] was out on patrol investigating.' " *State* v. *Donahue,* supra, 251 Conn. 647.

the car over. Our Supreme Court determined that none of these factors generated the requisite reasonable and articulable suspicion that the defendant was engaged or about to engage in criminal activity. In the present case, none of these factors fairly applies or was raised by the state. Therefore, in looking at all the distinguishing factors between *Donahue* and the present case, we can fairly state that *Donahue* is a different case than this one.

After verifying Jefferson's name as that of the man wanted, Walewski arrested Jefferson. While this was taking place, Peurea asked the defendant his name. The defendant lied about his name and when Peurea asked him for identification he could not produce any. Peurea asked him to get out of the car. At this time, Walewski suspected that the defendant could be Troy Lewis, the other person wanted on the Naugatuck warrant, not only because he knew that Jefferson had an accomplice, but because the defendant fit Lewis' general description. Knowing that Jefferson was wanted in connection with robberies and that those robberies were committed by more than one person, Peurea patted the defendant down and had him sit in the back of the patrol car until he could positively identify him. The defendant claims that such behavior by the police officers violated his constitutional rights because the officers did not have a reasonable and articulable suspicion to detain him.

If Walewski was constitutionally prohibited from investigating a dispatcher's report regarding a suspicious car and making brief inquiries of its occupants, not only would it stifle basic police work and be inexplicably unprotective of the general public, but it would logically require the dispatcher who received the complaint in the first instance to tell the anonymous caller that there was nothing the police could do. Furthermore, prohibiting this behavior would greatly disserve

the experience of sensible police officers in evaluating the totality of the circumstances, which must be taken into account. Under the circumstances, the officers were clearly not operating on hunches. The police officers, therefore, acted appropriately in arresting the defendant, and the evidence reasonably supports the court's decision to deny the defendant's motion to dismiss.

## B

The defendant claims that the trial court improperly refused to suppress his statement when it was not given after a knowing and intelligent waiver of his *Miranda* rights. We disagree.

"Pursuant to the fifth and fourteenth amendments to the United States constitution, a statement made by a defendant during custodial interrogation is admissible only upon proof that he . . . waived his rights [under *Miranda*] . . . . To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. . . . Although the issue is therefore ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence. . . .

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered by the trial court in determining whether an individual

had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation." (Citations omitted; internal quotation marks omitted.) *State* v. *Fernandez*, 52 Conn. App. 599, 610–11, 728 A.2d 1, cert. denied, 249 Conn. 913, 733 A.2d 229, cert. denied, 528 U.S. 939, 120 S. Ct. 348, 145 L. Ed. 2d 272 (1999). Furthermore, "[a] defendant's express written and oral waiver is strong proof that the waiver is valid." (Internal quotation marks omitted.) *State* v. *Northrop*, 213 Conn. 405, 418, 568 A.2d 439 (1990).

The trial court found that Peurea had read the defendant his rights and also gave him ample opportunity to read his rights for himself. Furthermore, there was no evidence that the defendant did not understand them or that he did not sign the form voluntarily.[28] It also found that at a later time when he was questioned by Yoemans, his rights were again presented to him on the statement itself, which he eventually initialed and signed and, therefore, he had another opportunity to be advised of his rights.[29]

---

[28] The defendant chose not to testify at the pretrial hearing on his motion to suppress. At trial, however, he testified that he told the Stratford police that he did not want to waive his *Miranda* rights and that the signature of "Troy Lewis" on the fingerprint form used on the night of the arrest was not written by him. Obviously, such evidence was contrary to that produced by the state.

We recognize that, on appeal in order to determine whether a defendant's constitutional rights have been infringed upon, we review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling challenged on appeal was made. See *State* v. *Shiflett*, 199 Conn. 718, 729, 508 A.2d 748 (1986). It is significant that the defendant never asked the trial court to reconsider its findings made at the suppression hearing in the light of his trial testimony.

[29] These rights not only included his right to remain silent, but also his right to seek the assistance of an attorney.

The trial court concluded that he was interrogated after he was properly in custody, *Miranda* warnings were properly given to him, he understood them and he voluntarily and willingly participated in the statement that he gave. Furthermore, the defendant was of an age, educational experience and appeared to be in a mental and physical condition to be of the capacity to comprehend what he was doing. There were no threats, promises, coercive or deceptive measures used, no evidence of any physical punishment, or anything designed to overcome his will to resist questioning. Our scrupulous review leads us to conclude that the defendant knowingly, willingly and voluntarily waived his *Miranda* rights which were properly and timely administered to him.

## C

The defendant also claims that the trial court improperly refused to suppress his statement when it was not given voluntarily. We disagree.

"[T]he use of an involuntary confession in a criminal trial is a violation of due process. *Mincey* v. *Arizona*, 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *Miranda* v. *Arizona*, 384 U.S. 436, 461–63, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); *State* v. *DeAngelis*, 200 Conn. 224, 232, 511 A.2d 310 (1986). The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence." (Internal quotation marks omitted.) *State* v. *Pinder*, 250 Conn. 385, 418, 736 A.2d 857 (1999).

"Our Supreme Court has recently clarified the proper scope of appellate review of a trial court's determination of voluntariness. . . . To begin, we note the established rule that the [t]rial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous.

. . . As [is] true concerning appellate review of determinations of custodial interrogation, although we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of voluntariness. In its review of state court determinations of voluntariness, the United States Supreme Court long has concluded that the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination. . . . Consistent with the well established approach taken by the United States Supreme Court, we review the voluntariness of a confession independently, based on our own scrupulous examination of the record. The ambiguity apparent in [prior Connecticut Supreme Court] cases is that, while correctly citing to the relevant federal case law for the proposition that we will conduct an independent determination of voluntariness . . . [our Supreme Court has also] continued to state in these same cases that [o]n the ultimate issue of voluntariness . . . we will conduct an independent and scrupulous examination of the entire record to ascertain whether the trial court's finding is supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Pin*, 56 Conn. App. 549, 556–57, 745 A.2d 204, cert. denied, 252 Conn. 951, 748 A.2d 299 (2000).

"In order to be voluntary a confession must be the product of an essentially free and unconstrained choice by the maker. . . . If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of the confession offends due process. . . . The determination of whether a confession is voluntary must be based on a consideration of the totality of circumstances surrounding it . . . including both the characteristics of the accused and

the details of the interrogation. . . . Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep." (Citations omitted; internal quotation marks omitted.) *State* v. *James*, 237 Conn. 390, 410–11, 678 A.2d 1338 (1996).

During his trial testimony, the defendant denied that the signature of "Troy Lewis" on his police statement had been written by him and that he had not seen, until he came to court, his police statement dated January 30, 1997. In addition, he said that the acts described in the statement were not his acts. The state again produced much evidence contradicting these claims.

Applying the factors previously discussed to the present case, we conclude that the facts of this case overwhelmingly substantiates the court's conclusion that the defendant's police statement was voluntary. The defendant was twenty-one years of age, had completed three years of high school and was literate. He had been thoroughly advised of, and understood, his constitutional rights. He expressed the willingness to speak to the police. He gave his statement about six hours after he was arrested and his interrogation was not constant over that period. There were no threats, promises, coercive or deceptive measures used to elicit a waiver. Therefore, upon our review of the entire record, we agree with the trial court's conclusion that the defendant's police statement was voluntarily made.

III

The defendants final claim is that the trial court improperly denied his motion for a mistrial because the court monitor allegedly played back more testimony

than the jury requested.[30] The defendant claims that this deprived him of a fair trial because it allowed the monitor to play back the portion of Walker's highly prejudicial in court testimony identifying the defendant as the man who attacked him. We decline to review this claim.

The following additional facts are relevant. On Tuesday, May 5, 1998, at the lunch break, the jury had the note presented to the court and the court, along with counsel, discussed it. The jury returned, the court read the note and indicated to the jury that it obtained the items of testimony for playback. The playback[31] started with the defendant's testimony and then went to Walker's testimony. The problem is, the transcript does not contain a restatement of what specific testimony the monitor played back as to either the defendant or Walker.

---

[30] The jury sent a note to the court during its deliberations asking to hear a portion of the testimony. The court responded as follows: "All right. At the—just at the lunch break, the jury gave the clerk a note which I have discussed with counsel. It asks [us to] read . . . some testimony from [the defendant] and also from Mr. Walker. The court monitor has indicated that she believes she has earmarked those areas and has them ready for playback. Is that correct? Right? Okay. So, when the jury comes out, I'll have—I'll read the note for the record and make this part of the record. Call them out, please. . . .

"Record will so reflect. All right, for the record, the court is in receipt of a note from the jury and I'll read it for the record and make this court's exhibit 1. First—first notation is as follows, [the defendant's] testimony regarding the documents which he did or did not sign and the manner in which he signs his name. Second part of this reads as follows, John Walker testimony regarding composite, review of police photos and timing of same.

"All right, ladies and gentlemen, we believe we have obtained those items of the testimony for playback, and hopefully we've got all of the portions that you're looking for. If, for any reason, what you're seeking does not sound like it's in the playback, when you go back in the room you can send me out another note. All right. You can start with [the defendant's]."

Whereupon, the court monitor played back the recording of the testimony.

[31] Defense counsel did not object to any of the playback at the time it took place.

On Wednesday, May 6, 1998, while court was in session, the court stated that it understood that the jury had reached a verdict but it would permit defense counsel to put something on the record concerning the playback of the previous day. Therefore, the defendant objected[32] saying that part of the playback contained Walker's in-court identification of the defendant and that was outside the scope of the request. The court then noted that the playback, having already occurred, could not be taken back and that, taken in context, it was helpful.[33] It further stated that it would not advise the jury otherwise. Thereupon, the defendant suggested that the effect could rise to the legal grounds for a mistrial. The court took that as a request for a mistrial and denied it.

The defendant claims that the trial court abused its discretion in refusing to grant a mistrial because of the alleged over playing of Walker's testimony by the court monitor. In doing so, he maintains that the playback included portions of Walker's testimony that were harmful as it placed undue emphasis on the testimony of the state's sole identification witness and that it deprived him of a fair trial.

We decline to review this claim. "It is up to the appellant to provide a record adequate to review his claims. Practice Book § 61-10. In the absence of an adequate record, we cannot conclude that the court abused its

---

[32] "[Defense Counsel]: I just wanted to object to part of the playback . . . . [F]ollowing the request from the jury of the read back of Walker's composite and review of the photos and timing of same, during the course of that playback there was . . . testimony about an in-court identification that he made, and that would be out of the scope of the request."

[33] "The Court: All right. That has already been played back for the jury, so we can't take it back at this point in time. I think it was all in context, however, with what they were seeking and it helped them understand the circumstances relating to the photo, especially the composite, so I think that it was proper. I would not advise them otherwise, and it's actually at this stage, it's already an accomplished fact. So, I can't unplay it. Your objection is noted for the record."

discretion." *Rosenblit* v. *Williams*, 57 Conn. App. 788, 796, 750 A.2d 1131, cert. denied, 254 Conn. 906, 755 A.2d 882 (2000). "Our role is not to guess at possibilities, but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the defendant's claims] would be entirely speculative." (Internal quotation marks omitted.) *Summerbrook West, L.C.* v. *Foston*, 56 Conn. App. 339, 347, 742 A.2d 831 (2000). We simply do not know what portion of Walker's testimony was played back by the court monitor. We cannot say, without speculating or guessing, whether it was within the jury's request. In considering the appellant's burden to provide an adequate record to support his claims of error, "[i]t is important to recognize that a claim of error cannot be predicated on an assumption that the trial court acted incorrectly. . . . Rather, it must be assumed that the trial court acted properly." (Citations omitted; internal quotation marks omitted.) *State* v. *One 1977 Buick Automobile*, 196 Conn. 471, 480–81, 493 A.2d 874 (1985).

An appellant is not without recourse, i.e., a motion for rectification under our rules of practice, to assist him in sustaining his burden of providing an adequate record for review. See Practice Book § 66-5. As noted, we do not have the evidence before us that is the factual predicate for the legal issue that the defendant asks us to consider. We must decline to review this claim.

The judgment is affirmed.

In this opinion the other judges concurred.