STATE OF CONNECTICUT *v.* DAVID BURROUGHS
(SC 17894)

Rogers, C. J., and Katz, Vertefeuille, Zarella and Schaller, Js.

---

Argued May 22—officially released September 23, 2008

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Kelley P. Swift*, former assistant state's attorney, for the appellant (state).

*Robert S. Bello*, with whom, on the brief, were *Patrick D. McCabe, Lawrence M. Lapine* and *Thomas M. Cassone*, for the appellee (defendant).

*Opinion*

ZARELLA, J. The sole issue in this appeal is whether the Appellate Court properly concluded that the defendant, David Burroughs, was seized within the meaning

of article first, §§ 7[1] and 9,[2] of the Connecticut constitution when two uniformed, armed police officers exited their patrol car and approached his vehicle. The state appeals from the Appellate Court's judgment, claiming that that court improperly reversed the trial court's determination that the conduct of the officers did not amount to an unconstitutional seizure of the defendant. The state specifically argues that such conduct would not have caused a reasonable person in the defendant's position to believe that he was not free to leave. We agree with the state and, accordingly, reverse the judgment of the Appellate Court.

The Appellate Court, relying on the trial court's memorandum of decision and articulation, set forth the following uncontested facts in its decision. "On the night of May 21, 2003, Joseph Duguay, a uniformed member of the Stamford police department since June, 1977, and his partner . . . Officer Robert Macari, were on patrol in a marked police vehicle. At approximately 10:30 p.m., the officers received a radio transmission from the police department dispatcher directing them to investigate a suspicious car in the area of 70 Dyke Lane. The vehicle was described as a possible black BMW with license plate 685 PXD.

"The officers drove to Dyke Lane and observed a black vehicle parked facing north in front of 70 Dyke Lane with two occupants: a male, later identified as the defendant, in the driver's seat, and a female, later identified as the defendant's cousin, in the front passenger seat. As the officers drove by the defendant's car, the officers did not observe any criminal or suspicious

---

[1] Article first, § 7, of the Connecticut constitution provides in relevant part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . . ."

[2] Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

activity on the part of the occupants of the vehicle. Dyke Lane in this area is primarily an industrial commercial area. The defendant's car, however, was parked in front of a private residence.

"The officers drove by the car and turned their vehicle around to bring it to the rear of the parked car. The parked car was a black Pontiac Grand Am, not a black BMW, and the license plate was 695 PXD, not 685 PXD. At all times while operating their police vehicle on Dyke Lane, the officers activated only the ordinary headlights on their vehicle. At no time did the officers activate their vehicle's siren or the overhead, side strobe lights or flashing colored lights.

"After parking behind the Grand Am, the officers exited their vehicle and approached the Grand Am. Duguay approached on the driver's side, and Macari approached on the passenger side. Neither officer drew his handgun; the guns remained in the respective holsters. The driver's side window had been lowered three to four inches. When Duguay approached the car window, he smelled marijuana and then noticed marijuana residue on the driver's jacket. Duguay testified that he had received training with regard to marijuana and that during his police service he had encountered and smelled marijuana 'tens, if not hundreds, of times.'

"At this time, Duguay asked the defendant to exit the car and directed him to place his hands on the front hood of the car. Then, Duguay conducted an external patdown for weapons. Duguay found no weapon.

"Meanwhile, another police vehicle arrived on Dyke Lane. Duguay asked the defendant to walk back to the rear of the patrol car, where two officers were now standing by. As the defendant walked toward the police car, he reached into his jacket and pulled out a bag of what was later determined to be marijuana, handed it to Officer Thomas Pjatuk, one of the officers who had

recently arrived on the scene, and then ran off. Duguay and Pjatuk pursued the defendant on foot and eventually apprehended him. The defendant was arrested . . . and brought back to the area of 70 Dyke Lane, where he was placed in the rear of a patrol car.

"Officer Yan Vanderven, who had been a member of the Stamford police department for about eight years when he testified, arrived at the Dyke Lane location with his partner, Officer Romano Malacone, in response to a police radio call about a foot pursuit in the area. As they arrived, Duguay and Pjatuk, together with their partners, returned with the defendant in custody.

"Once the defendant was in custody, Vanderven searched the Grand Am. When he opened the driver's door, he observed pieces of marijuana on the driver's seat. He also saw a plastic bag in a 'cubbyhole,' located in the dashboard to the left and a little below the steering wheel. He retrieved the bag and found that it contained a number of packages of what appeared to be crack cocaine, a narcotic that he testified he had encountered more than 100 times during his training and experience on the police force. In the trunk of the vehicle, he found a blue gym bag inside of which there was a plastic bag containing a number of smaller bags. All these items were secured and turned over to one of the officers at the scene.

"The defendant was arrested and charged with possession of narcotics with the intent to sell [by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b)] and possession of [marijuana in violation of General Statutes § 21a-279 (c)]. On November 24, 2004, the defendant filed a motion to suppress . . . . Following an evidentiary hearing on December 7, 2004, the court denied the defendant's motion." *State* v. *Burroughs*, 99 Conn. App. 413, 416–18, 914 A.2d 592 (2007). In denying the motion, the trial court concluded that the

police officers' conduct prior to the time that Duguay smelled the marijuana did not constitute a seizure because there was no use of physical force or demonstration of authority, and, therefore, there was no constitutional violation that would justify exclusion of the evidence.

Thereafter, the defendant, pursuant to General Statutes § 54-94a,[3] entered a conditional plea of nolo contendere to the charges of possession of narcotics with intent to sell and possession of marijuana. The trial court rendered judgment in accordance with the defendant's plea and sentenced the defendant to six years imprisonment and six years of special parole.

The defendant appealed to the Appellate Court, claiming that he was the victim of an illegal seizure and that the trial court improperly had denied his motion to suppress. The Appellate Court agreed and reversed with respect to the trial court's decision on the motion to suppress, concluding that a "seizure occurred at the time that the officers left their marked patrol car and began their approach [toward] the defendant's vehicle because a reasonable person would not have felt free to leave in that situation." Id., 421.

On appeal to this court,[4] the state claims that the defendant was not seized until after the police had

[3] General Statutes § 54-94a provides in relevant part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress . . . the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress . . . would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress. . . ."

[4] We granted the state's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that, under the state constitution, the police conduct constituted a seizure when the police left their patrol car and began to approach the defendant's vehicle?" *State* v. *Burroughs*, 282 Conn. 909, 922 A.2d 1099 (2007).

developed a reasonable and articulable suspicion that he was engaged in criminal activity, which occurred when Duguay came close enough to the defendant's vehicle to detect the smell of marijuana. The state thus claims that the trial court properly denied the defendant's motion to suppress evidence of the contraband discovered in his possession. The defendant responds that he was seized illegally prior to the existence of probable cause or a reasonable and articulable suspicion justifying an investigative stop when the police officers exited their patrol car and began to approach his vehicle. We agree with the state and conclude that there was an insufficient show of police authority before the officers detected the smell of marijuana to establish a seizure under the state constitution.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Blackman*, 246 Conn. 547, 553, 716 A.2d 101 (1998). We undertake a more probing factual review when a constitutional question hangs in the balance. See *State* v. *Damon*, 214 Conn. 146, 154, 570 A.2d 700 ("[w]here a constitutional issue turns [on] a factual finding . . . our usual deference . . . is qualified by the necessity for a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence" [internal quotation marks omitted]), cert. denied, 498 U.S. 819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990). In the present case, in which we are required to determine whether the defendant was seized by the police, we are presented with a mixed

question of law and fact that requires our independent review.[5] See *Thompson* v. *Keohane*, 516 U.S. 99, 112–13, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995).

We next articulate the legal test used to determine when a person is "seized" within the meaning of article first, §§ 7 and 9, of our state constitution. We previously have concluded that a person is seized when, "by means of physical force or a show of authority, his freedom of movement is restrained." (Internal quotation marks

[5] We note that, although the United States Supreme Court articulated this standard in the context of reviewing a trial court's determination that a defendant was in custody for purposes of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); see *Thompson* v. *Keohane*, 516 U.S. 99, 112–13, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995); the test for determining custody for *Miranda* purposes is the same in all material respects as the test that this court uses to determine whether an individual is seized, that is, whether a reasonable person in the defendant's position would have believed that he was not free to leave.

We also note that this court has been inconsistent in articulating the test for reviewing whether a seizure has occurred. In one line of cases, we have stated that whether a seizure occurred is a question of fact. E.g., *State* v. *Santos*, 267 Conn. 495, 504, 838 A.2d 981 (2004); *State* v. *Hill*, 237 Conn. 81, 87, 675 A.2d 866 (1996); *State* v. *Ostroski*, 186 Conn. 287, 292, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982). In other cases, we have distinguished between the trial court's findings of "historical" fact, which we do not overturn unless they are clearly erroneous, and the ultimate question of whether a seizure occurred, which is subject to a "scrupulous independent review of the record to ensure that the trial court's determination was supported by substantial evidence." *State* v. *James*, 237 Conn. 390, 405–406, 678 A.2d 1338 (1996); see also *State* v. *Atkinson*, 235 Conn. 748, 759 & n.17, 670 A.2d 276 (1996).

We now clarify that appellate review of whether a seizure occurred is a mixed question of law and fact, and when there is no dispute as to the underlying facts, as in the present case, or when the trial court's finding of historical facts is not clearly erroneous or is supported by substantial evidence, it is the duty of the reviewing court to make an independent legal determination of whether a reasonable person in the defendant's position would have believed that he was not free to leave. See *Thompson* v. *Keohane*, supra, 516 U.S. 112–13; see also *State* v. *Atkinson*, supra, 235 Conn. 773 n.3 (*Berdon, J.*, dissenting). Although the majority in *Atkinson* noted that we never have expressly labeled this determination a mixed question of law and fact; *State* v. *Atkinson*, supra, 759 n.17; we do so now to avoid confusion in future cases in which appellate review is required.

omitted.) *State* v. *Ostroski*, 186 Conn. 287, 291, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982).[6] The key consideration is whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[7] (Internal quotation marks omitted.)

[6] We recognize that the United States Supreme Court has clarified the operation of the *Mendenhall* test in determining whether an individual is seized under the fourth amendment to the federal constitution. In *California* v. *Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), the court declared that *Mendenhall* "states a *necessary*, but not a *sufficient*, condition for seizure—or, more precisely, for seizure effected through a 'show of authority.' *Mendenhall* establishes that the test for existence of a 'show of authority' is an objective one . . . ." (Emphasis in original.) Id., 628. The court in *Hodari D.* equated seizure with common-law arrest and fashioned a bright line test on that basis, stating that "[a]n arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." (Emphasis in original.) Id., 626.

We expressly have declined, however, to incorporate the Supreme Court's definition of "seizure" in *Hodari D.* into our own constitutional jurisprudence. *State* v. *Oquendo*, 223 Conn. 635, 652, 613 A.2d 1300 (1992) ("we decline to adopt the restricted definition of a seizure employed by the United States Supreme Court in *Hodari D.* and adhere to our precedents in determining what constitutes a seizure under the state constitution"). Although the state urges us to address the continued validity of our decision in *Oquendo* to reject *Hodari D.*, we do not believe that the facts in the present case provide the appropriate context for consideration of the question and we therefore decline to do so.

[7] The United States Supreme Court has acknowledged that not all circumstances are amenable to a straightforward application of the *Mendenhall* "free to leave" test. The paradigmatic situation in which this test is particularly inappropriate is when the individual does not feel free to leave for some reason *other than* police conduct. In *Florida* v. *Bostick*, 501 U.S. 429, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991), the court noted the obvious inadequacy of the *Mendenhall* test under such circumstances: "When police attempt to question a person who is . . . seated on a bus and has no desire to leave the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter." Id., 435–36. The court refined the *Mendenhall* test to make it more broadly applicable: "In such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Id., 436.

In *State* v. *Hasfal*, 106 Conn. App. 199, 206–207, 941 A.2d 387 (2008), the Appellate Court discussed the *Bostick* test. While recognizing that "[t]he 'free to leave' test is a good fit for a *Miranda* inquiry when the police

Id., 292, quoting *United States* v. *Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). The inquiry is objective, focusing on a reasonable person's probable reaction to the officer's conduct. See, e.g., *State* v. *Santos*, 267 Conn. 495, 503, 838 A.2d 981 (2004) ("[i]n determining the . . . question of whether there has been a seizure, we examine the effect of the police conduct at the time of the alleged seizure, applying an objective standard" [internal quotation marks omitted]).

The defendant in the present case does not allege, and there is no evidence in the record to suggest, that the police officers applied physical force upon him. We therefore restrict our inquiry to whether there was a sufficient show of authority by the officers to constitute a seizure. A proper analysis of this question is necessarily fact intensive, requiring a careful examination of the entirety of the circumstances in order to determine whether the police engaged in a coercive display of authority such that a reasonable person in the defendant's position would not have felt free to leave. See *State* v. *Ostroski*, supra, 186 Conn. 292; see also *People* v. *Bora*, 83 N.Y.2d 531, 535, 634 N.E.2d 168, 611 N.Y.S.2d 796 (1994) ("There are no bright lines separating various types of police activity. Determining whether a seizure occurs . . . involves a consideration of all the facts and a weighing of their individual significance . . . .").

In *United States* v. *Mendenhall*, supra, 446 U.S. 554, the Supreme Court listed a number of factors that, "in view of all of the circumstances surrounding the incident," might indicate a sufficient show of authority to create a seizure. "Examples of circumstances that might

interrogate someone at a police station"; id.; the court noted that such a test is "unsuitable . . . [when] it is unclear where else the defendant would have gone in the absence of his detention." Id., 207. We previously have not had an opportunity to address such circumstances directly and need not do so in the present case.

indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Id.; see also *Michigan* v. *Chesternut*, 486 U.S. 567, 575, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988) ("[T]he police conduct involved . . . would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon [the] respondent's freedom of movement. The record does not reflect that the police activated a siren or flashers; or that they commanded [the] respondent to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block [the] respondent's course or otherwise control the direction or speed of his movement."). Relevant factors described by other courts as useful in assessing "the degree of authority exhibited by the police officer during his interaction with an individual" include "restricting a defendant's freedom of movement or . . . isolating him in some manner . . . parking [the police] cruiser in close proximity to a defendant's vehicle, displaying weapons . . . [or using verbal commands to indicate that the defendant is not free] to terminate the encounter." (Citations omitted.) *State* v. *Kimble*, 106 Conn. App. 572, 589, 942 A.2d 527, cert. denied, 287 Conn. 912, 950 A.2d 1289 (2008); see also *People* v. *Bora*, supra, 83 N.Y.2d 535–36 (relevant inquiries include "was the officer's gun drawn, was the individual prevented from moving, how many verbal commands were given, what was the content and tone of the commands, how many officers were involved and where the encounter took place").

In the present case, the Appellate Court concluded that the defendant was seized at some point after the officers parked their patrol car behind his vehicle but

before Officer Duguay detected the smell of marijuana. See *State* v. *Burroughs*, supra, 99 Conn. App. 421. The circumstances on which the Appellate Court relied in drawing this conclusion included the time of night, the marked police cruiser, the fact that the officers were uniformed and armed, the fact that the patrol car's headlights were illuminated when the officers pulled up behind the defendant's vehicle, and the fact that the officers approached from behind on both sides of the defendant's vehicle. Id., 421–22. The Appellate Court thus rejected the reasoning of the trial court, which had relied on *State* v. *Lewis*, 60 Conn. App. 219, 759 A.2d 518, cert. denied, 255 Conn. 906, 762 A.2d 911 (2000), in reaching the opposite conclusion.

In *Lewis*, a police officer was dispatched at night to investigate an anonymous report of a suspicious vehicle. Id., 234. Upon arriving at the location, the officer, who was alone, parked his patrol car behind the suspicious vehicle but did not activate his car's flashing lights or siren. Id. He then exited the car carrying a flashlight, approached the suspicious vehicle, tapped on the window and asked the occupants what they were doing there. Id. The driver responded that his car had broken down and that he was waiting for assistance. Id. After failing to produce identification, the driver told the officer his name, at which point the officer recognized him as someone wanted on an outstanding warrant. Id., 234–35. Upon confirming that the driver was indeed the individual named in the warrant, the officer arrested him.[8] Id., 235.

Prior to trial, the defendant in *Lewis* filed a motion to dismiss the case on the ground that the officer lacked a reasonable and articulable suspicion to detain him.

---

[8] The defendant in *Lewis* was the other occupant of the car and was arrested at the scene after being identified as the individual wanted on another arrest warrant. *State* v. *Lewis*, supra, 60 Conn. App. 235.

Id., 237. The trial court denied the motion, ruling that, under the circumstances, the police had a right to investigate the report of a suspicious vehicle and to inquire as to the activity of its occupants. See id. The Appellate Court affirmed the judgment, concluding that no seizure had occurred. Id., 241.

We agree with the trial court that the salient facts of the present case are similar to those in *Lewis*, *Mendenhall* and other previously cited cases in which it was concluded that the police conduct in question did not constitute a seizure. See *Michigan* v. *Chesternut*, supra, 486 U.S. 574–76; *United States* v. *Mendenhall*, supra, 446 U.S. 555; *State* v. *Kimble*, supra, 106 Conn. App. 589–91; *State* v. *Lewis*, supra, 60 Conn. App. 241; *People* v. *Bora*, supra, 83 N.Y.2d 535–36. The officers in the present case were dispatched to investigate an anonymous report of a suspicious vehicle. Reaching the address indicated in the dispatcher's report, the officers observed a vehicle essentially matching the description in the report. After they drove past the defendant's vehicle, they turned around and parked behind it. At no time prior to detecting the smell of marijuana did the officers activate their overhead flashing lights,[9] side spotlights or sirens, direct any verbal commands to the defendant or communicate with him in any way. The officers were uniformed and armed but never unholstered or even gripped their firearms. Although we recognize that a uniformed law enforcement officer is necessarily cloaked with an aura of authority, this cannot, in and of itself, constitute a show of authority sufficient to satisfy the test for a seizure under *Mendenhall*. See *State* v. *Hill*, 237 Conn. 81, 91, 675 A.2d 866 (1996) ("[t]he mere approach by a police officer, either in a

[9] We find it insignificant that the officers in the present case kept their headlights on, as this is a reasonable practice that would seem necessary, or at least advisable, for the officers' and the occupants' safety when the event occurs at night.

police car or on foot, does not alone constitute a show of authority sufficient to cause the subject of the officer's attention reasonably to believe that he or she is not free to leave"); see also *State* v. *Kimble*, supra, 590–91. The consequences of a contrary conclusion would be significant indeed, for any police presence at all would then necessitate a finding of a show of authority sufficient to satisfy the test for determining whether a seizure occurred. We thus conclude that the mere presence of the two officers, unaccompanied by any aggressive or coercive police conduct, did not constitute a show of authority within the meaning of *Mendenhall* and that it was not improper for the officers to make a brief inquiry of the defendant to determine whether he or his passenger required assistance.

The defendant argues that the facts of the present case more closely resemble those of *State* v. *Donahue*, 251 Conn. 636, 643, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000), in which this court concluded that the police conduct in question constituted a seizure. We disagree. In that case, a police officer was on a routine patrol at approximately 2 a.m. in an area known for drug dealing and prostitution when he observed a vehicle turn abruptly into the vacant parking lot of a social club that had closed for the evening. Id., 639. The officer followed and pulled up behind the vehicle, which was facing the parking lot exit. Id., 640. The officer then activated his red, yellow and blue flashers and, upon contacting headquarters, determined that the vehicle was not stolen and that there were no outstanding warrants for its registered owner. Id. The officer subsequently exited his patrol car and approached the vehicle to ask the driver for his license and registration. Id. When the driver rolled down his window, the officer detected alcohol on his breath, and, after the driver failed a field sobriety test, the officer arrested him for operating a

motor vehicle under the influence of intoxicating liquor. Id.

In denying a motion to suppress, the trial court in *Donahue* concluded that the officer possessed a reasonable and articulable suspicion that the driver was engaged in criminal activity. Id., 641. The Appellate Court affirmed the trial court's denial of the motion to suppress and agreed with the court's reasoning. Id. The certified question on appeal to this court was whether "the Appellate Court properly conclude[d] that the police had a reasonable and articulable suspicion to justify stopping the . . . vehicle?" Id., 639 n.4.

It is important to note that "the issue of whether [the officer's] detention of the driver constituted a 'seizure' [was] not a certified issue before this court . . . ." Id., 642. The trial court had determined, largely on the basis of a concession by the state, that the driver was seized after the officer pulled up behind his car and activated the patrol car's overhead flashing lights. Id., 643. The Appellate Court did not disturb this finding and we agreed without further discussion. Id. We ultimately reversed the judgment of the Appellate Court; id., 648; concluding that the seizure of the driver was not warranted by sufficient indicia of suspicion. Id., 645 (factors cited by officer as reasons for detention "[did] not form the proper bases for rational inferences that warrant[ed] [the officer's] intrusion [and] . . . [did] not rise to the standard of a reasonable suspicion that we have found in other cases").

We conclude that the facts in *Donahue* are distinguishable from those in the present case. We agree that a reasonable person in the defendant's position would not have felt free to leave if, as in *Donahue*, the officers in the present case had demonstrated their authority by pulling up behind the defendant's vehicle and activating their patrol car's overhead flashing lights. See id., 643.

In the present case, however, there was no significant show of authority by the police officers when they simply pulled up behind the defendant's vehicle without activating their patrol car's sirens or flashing lights, exited the patrol car and approached the defendant's vehicle for the purpose of determining whether the defendant needed assistance. The defendant's argument is therefore unpersuasive.

The defendant also argues that he was seized before the officers detected the smell of marijuana coming from his vehicle because Officer Duguay testified that his subjective intent was to "detain and investigate" and that he would have pulled the defendant over if the defendant had attempted to drive away before the officers were able to approach and make their inquiry. We disagree.

It is well established that an officer's subjective intent in pulling over a motorist is irrelevant to the question of whether the officer's conduct violates the constitution. See, e.g., *Whren* v. *United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) ("foreclose[ing] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved"); see also *State* v. *Rodriguez*, 239 Conn. 235, 245 n.17, 684 A.2d 1165 (1996) ("the standard for determining whether reasonable suspicion or probable cause existed in a given scenario is an objective, rather than a subjective, one"). It follows that an officer's speculation regarding his own hypothetical future conduct, even if such conduct would have been unconstitutional, is irrelevant to an analysis of the actions actually taken by the police in any given case.

There are also strong policy arguments in support of the officers' conduct in this case. As the Appellate Court stated in *State* v. *Lewis*, supra, 60 Conn. App. 219, "[i]f

[an officer is] constitutionally prohibited from investigating a dispatcher's report regarding a suspicious car and making brief inquiries of its occupants, not only would it stifle basic police work and be inexplicably unprotective of the general public, but it . . . would greatly disserve the experience of sensible police officers in evaluating the totality of the circumstances, which must be taken into account." Id., 243–44; see also *State* v. *Foote*, 85 Conn. App. 356, 361, 857 A.2d 406 (2004) (discussing community caretaking functions of local police officers, such as assisting motorists, apart from functions of "detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" [internal quotation marks omitted]), certs. denied, 273 Conn. 937, 875 A.2d 43, 44 (2005); *State* v. *Kidd*, 59 Conn. App. 598, 602, 757 A.2d 1168 (2000) ("[c]ourts have made clear that police officers do not bring about a seizure merely by asking questions of a citizen, even when the officer identifies himself as a police officer" [internal quotation marks omitted]), cert. denied, 255 Conn. 932, 767 A.2d 106 (2001). It is axiomatic that the constitution does not prohibit, or even discourage, healthy, mutually beneficial intercourse between the public and the police sworn to protect them. See, e.g., *Immigration & Naturalization Service* v. *Delgado*, 466 U.S. 210, 215, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984) ("[o]bviously, not all personal intercourse between policemen and citizens involves seizures of persons" [internal quotation marks omitted]), quoting *Terry* v. *Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *Florida* v. *Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) ("law enforcement officers do not violate the [f]ourth [a]mendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evi-

dence in a criminal prosecution his voluntary answers to such questions"); *United States* v. *Mendenhall,* supra, 446 U.S. 554 ("characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the [f]ourth [a]mendment, would impose wholly unrealistic restrictions [on] a wide variety of legitimate law enforcement practices"); *United States* v. *Thompson,* 941 F.2d 66, 69 (2d Cir. 1991) ("[e]ven if officers have no basis to suspect an individual, they may generally ask him questions"); *State* v. *Davis,* 85 Conn. App. 755, 761, 859 A.2d 50 (2004) ("[t]he police officers' questioning of the defendant alone did not constitute a seizure or illegal activity").

Clearly, in the ordinary course of a police officer's performance of his duty to guard the public safety and welfare, there is much laudable interaction between the officer and citizenry. Such positive discourse and conscientious policing should not be stifled in the absence of a showing of some "arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." (Internal quotation marks omitted.) *Immigration & Naturalization Service* v. *Delgado,* supra, 466 U.S. 215, quoting *United States* v. *Martinez-Fuerte,* 428 U.S. 543, 554, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976). This is the primary reason why an individual is not considered seized by the police, thus implicating constitutional safeguards, unless and until, "by means of physical force or a show of authority, his freedom of movement is restrained" such that "a reasonable person would have believed that he was not free to leave." (Internal quotation marks omitted.) *State* v. *Hill,* supra, 237 Conn. 87.

We appreciate and adopt these sensible policy considerations in weighing the actions of the officers in this case against any possible intrusion on the defendant's privacy. Concluding that the conduct of the officers amounted to an unconstitutional seizure would lead to

just the sort of illogical result that the court in *Lewis* sought to avoid. See *State* v. *Lewis*, supra, 60 Conn. App. 243–44. Police officers must be given some measure of reasonable discretion and flexibility to fulfill their duties. See, e.g., *Florida* v. *Royer*, supra, 460 U.S. 497; *United States* v. *Mendenhall*, supra, 446 U.S. 554; *State* v. *Lewis*, supra, 243–44. Allowing officers to approach a vehicle and make minimal inquiries of its occupants serves important law enforcement purposes without jeopardizing constitutional rights. In the present case, although the officers did not observe any overt signs of criminal activity when they drove past the defendant's vehicle, they also could not determine if the vehicle was disabled or if the passengers were in distress. We therefore conclude that, because the conduct of the officers did not constitute a show of authority sufficient to cause a reasonable person in the defendant's position to believe that he was not free to leave, and in light of the important public policy considerations that we previously have enumerated, no illegal seizure occurred.

The judgment of the Appellate Court is reversed only as to that court's reversal of the defendant's conviction of possession of narcotics with the intent to sell by a person who is not drug-dependent and of possession of marijuana, and the case is remanded to that court with direction to affirm the judgments of the trial court.[10]

In this opinion the other justices concurred.

---

[10] We note that there were two judgments of conviction on appeal to the Appellate Court, one involving the defendant's conviction of possession of narcotics with the intent to sell by a person who is not drug-dependent, possession of marijuana and failure to appear in the first degree, and another involving the defendant's conviction of forgery in the second degree. See *State* v. *Burroughs*, supra, 99 Conn. App. 415 and n.2. Although the Appellate Court reversed the defendant's conviction on the drug possession charges, it affirmed the trial court's judgments in all other respects. Id., 428. We affirm the Appellate Court's judgment insofar as that court affirmed the defendant's conviction of the charges other than the drug possession charges.