STATE OF CONNECTICUT *v.* JEREMY KELLY
(AC 30282)

Bishop, Lavine and Borden, Js.

Argued March 14—officially released May 31, 2011

*Matthew Bristol*, certified legal intern, with whom were *Timothy H. Everett*, special public defender, and *Irene Kim*, certified legal intern, and, on the brief, *Jody Mullis* and *Timothy Nast*, certified legal interns, for the appellant (defendant).

*Margaret Gaffney Radionovas*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Robert Diaz*, assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Jeremy Kelly, appeals from the judgment of conviction following his conditional plea of nolo contendere[1] to possession of cocaine

---

[1] General Statutes § 54-94a provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law provided a trial court has determined that a ruling on such motion to suppress or motion to dismiss would be dispositive of the case. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

with intent to sell in violation of General Statutes § 21a-277 (a). The defendant's plea followed the trial court's denial, after an evidentiary hearing, of his motion to suppress evidence as the fruit of an illegal seizure of his person. On appeal, the defendant claims that the court improperly (1) determined that the seizure was constitutionally permissible and (2) allocated the burden of proof to the defendant. We affirm the judgment of the trial court.

The court reasonably could have found the following facts from the evidence adduced at the hearing. On March 27, 2007, Detective William Rivera of the Hartford police department received information from a reliable confidential informant that a certain Pedro Gomez, residing in the area of Brown Street in Hartford, was in possession of a firearm.[2] Having also discovered that Gomez was the subject of an outstanding arrest warrant for violation of probation, Rivera and Lieutenant Jose Angeles of the department of correction drove to the area in an unmarked car and dressed in plain clothes. They had a description of Gomez as a Hispanic male of medium complexion with short hair, twenty to twenty-two years of age, between 130 and 150 pounds and between five feet, five inches and five feet, seven inches tall. The informant also had alerted Rivera that sometimes Gomez disguised himself by wearing a dark wig.

At approximately 11 a.m., the officers observed two men, later identified as the defendant and Rafael Burgos, walking and talking together on the sidewalk. There was a gas station on the corner that was a known location for drug dealing, and Rivera suspected that the men had just left that location. As the officers approached, they determined that Burgos fit the

---

[2] The confidential informant had given Rivera information in the past that had led him to persons in possession of firearms.

description of Gomez. As Burgos and the defendant walked into the driveway at 13-15 Brown Street, they made eye contact with the officers and Burgos moved his foot as if he was going to run. Both men continued to walk slowly toward the rear of the building, looking backwards. Angeles noticed that the defendant was clutching his waistband. Stopping his vehicle in front of the driveway, Rivera displayed his badge and stated, "I'm a police officer," and, "come to the vehicle." Angeles also displayed his badge. Burgos replied, "for what?" and the defendant stated, "I live here." Burgos and the defendant continued walking up the driveway. Rivera then pulled the car into the driveway east of 13-15 Brown Street. The officers did not activate their vehicle's lights or siren and had not drawn their firearms.

As Angeles began to step out of the vehicle, he ordered the men to "stop, stop, come here." At that point, they fled. The defendant ran behind the house. Rivera drove the car to the front of 13-15 Brown Street and observed the defendant run around the front of the house and up the street, still clutching his waistband, while Angeles chased him on foot. Rivera drove alongside them up the street and then turned into a driveway to block the defendant's path. The defendant changed course, and Rivera began chasing him on foot. Rivera saw the defendant drop a clear plastic bag containing a white substance. When the defendant tripped and fell, Rivera tackled him and handcuffed him after a thirty second struggle. Rivera seized the bag that the defendant had dropped and also seized another clear plastic bag containing a large amount of a white, rock like substance from the defendant's clenched hand.

Following his arrest, the defendant was charged with possession of narcotics with intent to sell in violation of General Statutes § 21a-278 (b), possession of narcotics within 1500 feet of an elementary school in violation

of General Statutes § 21a-279 (d), possession of narcotics in violation of General Statutes § 21a-279 (a), interfering with an officer in violation of General Statutes § 53a-167a and criminal trespass in the third degree in violation of General Statutes § 53a-109. He filed a motion to suppress the evidence seized during the encounter, claiming that he had been illegally seized by the officers when they displayed their badges and told him to approach the vehicle. Following an evidentiary hearing on July 9, 2008, the court issued an oral decision denying the motion.[3] The defendant subsequently entered a conditional plea of nolo contendere to the crime of possession of cocaine with intent to sell in violation of § 21a-277 (a), and the court sentenced him to nine years incarceration, suspended after three and one-half years, and three years probation. This appeal followed.

I

The defendant first claims that he was illegally seized by the officers in violation of his rights under the fourth amendment to the United States constitution and article first, § 7, of the constitution of Connecticut.[4] He argues that he was seized when they displayed their badges and stated, "come to the vehicle" and that this seizure was illegal because the officers lacked a reasonable

---

[3] The trial court subsequently filed an articulation in response to an order from this court.

[4] The defendant also claims that the seizure violated his rights under article first, § 9, of our state constitution. That section provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law." As our Supreme Court has held, "the defendant's reliance on this section is, in essence, superfluous, because, in the search and seizure context, article first, § 9, is our criminal due process provision that does not provide protections greater than those afforded by either the fourth amendment or its coordinate specific state constitutional provision, article first, § 7." *State* v. *Jenkins*, 298 Conn. 209, 259 n.39, 3 A.3d 806 (2010); see also *State* v. *Oquendo*, 223 Conn. 635, 669 n.1, 613 A.2d 1300 (1992) (*Borden, J.*, dissenting).

and articulable suspicion that he had committed or was about to commit a crime independent of any suspicion they harbored toward Burgos. In particular, he argues that the trial court improperly determined that, under these facts, the public interest in police officer safety justified the seizure even in the absence of reasonable suspicion as to the defendant. We agree with the trial court.

We begin with our standard of review and the governing legal principles. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . We undertake a more probing factual review when a constitutional question hangs in the balance." (Citation omitted; internal quotation marks omitted.) *State* v. *Burroughs*, 288 Conn. 836, 843, 955 A.2d 43 (2008).

"Ordinarily, [w]hen considering the validity of a . . . stop, our threshold inquiry is twofold. . . . First, we must determine at what point, if any, did the encounter between [the police officer] and the defendant constitute an investigatory stop or seizure. . . . Next, [i]f we conclude that there was such a seizure, we must then determine whether [the police officer] possessed a reasonable and articulable suspicion at the time the seizure occurred." (Internal quotation marks omitted.) *State* v. *Clark*, 297 Conn. 1, 7–8, 997 A.2d 461 (2010). "[In a case] in which we are required to determine whether the defendant was seized by the police, we are presented with a mixed question of law and fact that requires our independent review." *State* v. *Burroughs*, supra, 288 Conn. 843–44.

We begin our analysis with a discussion of the legal test used to determine whether a person is seized. Our Supreme Court has clarified that article first, § 7, of the Connecticut constitution "afford[s] greater protection to the citizens of this state than does the federal constitution in the determination of what constitutes a seizure." *State* v. *Oquendo*, 223 Conn. 635, 649–50, 613 A.2d 1300 (1992). Accordingly, we look to the decisional precedents of our state, rather than federal precedent, to guide our determination of this question. Our Supreme Court has articulated that "a person is seized when, by means of physical force or a show of authority, his freedom of movement is restrained. . . . The key consideration is whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. . . . The inquiry is objective, focusing on a reasonable person's probable reaction to the officer's conduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Burroughs*, supra, 288 Conn. 844–46.

In the present case, the officers stopped their car near the defendant and Burgos, displayed their badges and told the men to approach the vehicle. Because they applied no physical force at this juncture, we restrict our inquiry to whether they engaged in a coercive display of authority such that a reasonable person in the defendant's position would not have felt free to leave. Under similar facts in *Oquendo*, in which an armed police officer stood outside his marked vehicle and told the defendant to approach the vehicle and to bring his bag, the Supreme Court determined that the defendant had been seized. *State* v. *Oquendo*, supra, 223 Conn. 652–53. Although the officers in the present case were in an unmarked car and did not indicate whether they were armed, they did display the badges of their authority and commanded the defendant and Burgos to approach. On the basis of these facts, we are persuaded

that a reasonable person in the defendant's position would not have believed that he was free to ignore the command and walk away.[5] See id. We conclude, therefore, that the defendant was seized within the meaning of article first, § 7, of the Connecticut constitution.[6]

We next set forth the legal test used to determine whether an investigatory stop or seizure is constitutional. The standards governing our analysis under article first, § 7, of our state constitution, "mirror those set forth by the United States Supreme Court in *Terry* v. *Ohio,* [392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)], with regard to [federal] fourth amendment analysis . . . ." *State* v. *Oquendo,* supra, 223 Conn. 654. "[T]he touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security . . . and that reasonableness depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers . . . ." (Citations omitted; internal quotation marks omitted.) *Maryland* v. *Wilson,* 519 U.S. 408, 411, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997). "[A] police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer

---

[5] The fact that the defendant did, in fact, continue walking away is not pertinent to the objective question of whether a reasonable person would have felt free to leave.

[6] We note, however, that the defendant was not seized as defined in federal fourth amendment jurisprudence. Under federal law, a person is seized by a show of authority only if he submits to it; *California* v. *Hodari D.,* 499 U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991); which did not occur in the present case. Accordingly, the first seizure under the fourth amendment occurred when Rivera tackled the defendant. By the time that physical force was applied, Rivera had probable cause to believe that the defendant was engaged in criminal conduct when he fled and visibly tossed away a plastic bag while being pursued. Under federal jurisprudence, therefore, the defendant's claim of illegal seizure would be to no avail.

believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to make an arrest." (Internal quotation marks omitted.) *State* v. *Clark*, supra, 297 Conn. 9; see also *Terry* v. *Ohio*, supra, 392 U.S. 21. "[T]he officer may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions." (Internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 233, 3 A.3d 806 (2010).

The defendant, nevertheless, claims that his seizure was unlawful because the officers lacked a reasonable and articulable suspicion that he was engaged in criminal activity independent of their suspicion of Burgos. The state argues in opposition that an independent reasonable suspicion regarding the defendant was not required because the risk to the officers' safety during their legal stop of Burgos[7] outweighed the defendant's liberty interest. We note that the state has a "weighty interest in promoting the safety of its police officers" and that "[w]hile we respect the constitutional rights against unreasonable search and seizure of the citizenry, [c]ertainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." (Internal quotation marks omitted.) *State* v. *Mann*, 271 Conn. 300, 317–18, 857 A.2d 329 (2004), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005).

We are bound by the principle that our state constitution may not provide less protection for the exercise of individual rights than the minimum national standard

---

[7] The defendant conceded during the suppression hearing that the officers had reasonable suspicion to stop Gomez and that their reasonable belief that Burgos was Gomez justified their stop of Burgos. Although the defendant asserts that the stop of Burgos lasted longer than was necessary to dispel the officers' suspicion, it remains undisputed that they had a legal ground to initiate the stop.

provided under the United States constitution; see *State v. Oquendo*, supra, 223 Conn. 649; which generally requires that an officer have a particularized suspicion before making an investigatory stop. See *Terry* v. *Ohio*, supra, 392 U.S. 21. The United States Supreme Court, however, has recognized that limited, incrementally intrusive seizures that are not based on reasonable suspicion are occasionally required in the interest of officer safety, for example, during a traffic stop or during the execution of a search warrant of premises. See respectively, e.g., *Maryland* v. *Wilson*, supra, 519 U.S. 408; *Michigan* v. *Summers*, 452 U.S. 692, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981). Whether the reasoning in these cases applies to a nonvehicular on-the-street encounter is a matter of first impression for appellate review.

In the context of a traffic stop, the United States Supreme Court has taken the unprecedented step of authorizing seizures that are unsupported by any individualized suspicion whatsoever and held that, during a traffic stop, an officer also may order any passenger out of the car as a precautionary measure. *Maryland* v. *Wilson*, supra, 519 U.S. 415.[8] It noted that many officers have been assaulted and killed during traffic stops. Id., 413. It also reasoned that the presence of passengers increases the possible sources of harm to the officer because any incriminating evidence discovered during the stop likely would implicate a passenger as much as the driver. Id., 413–14. The court then balanced these safety risks against the intrusion on personal liberty required to mitigate them. Id. It found that permitting an officer to direct the movements of the passengers would constitute only a minimal incremental intrusion

---

[8] Similarly, our state Supreme Court has reasoned that, during a traffic stop, an officer "prudently may prefer to ask that an occupant exit the vehicle; any intrusion upon an occupant's personal liberty in directing that action is de minimis because, on balance, it serves to protect the officer." (Internal quotation marks omitted.) *State* v. *Dukes*, 209 Conn. 98, 122, 547 A.2d 10 (1988).

on their liberty because they were already inconvenienced by virtue of the stop of the vehicle. Id. Consequently, it concluded that the officer permissibly could seize the passengers pending completion of the traffic stop despite a lack of particularized suspicion of the passengers. Id., 414–15.

The United States Supreme Court has struck an analogous balance between the interests of personal liberty and officer safety in the context of the execution of a search warrant of premises, holding that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan* v. *Summers*, supra, 452 U.S. 705. The court reasoned that the execution of a warrant to search for narcotics or weapons is particularly dangerous and that the presence of multiple occupants increases that risk. Id., 702–703; see also *Muehler* v. *Mena*, 544 U.S. 93, 100, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005). It also stated that "unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Maryland* v. *Buie*, 494 U.S. 325, 333, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990). Conversely, in regard to the intrusion on the occupants' liberty, the detention is merely incremental to the search itself, is occasioned by probable cause to search as found by a neutral magistrate and is not stigmatizing because it is not in public. On balance, therefore, the court has held that the suspicionless detention is permissible because "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Michigan* v. *Summers*, supra, 702–703.

The defendant contends that the safety risks to officers attendant to stopping vehicles are not present during an on-the-street stop, and, therefore, the reasoning in the traffic stop and search warrant contexts does not pertain to the present case. The state argues to the contrary that the same safety issues addressed in traffic stop cases may arise in a nonvehicular stop, thereby justifying the momentary suspicionless stop of an individual on the street who is in the company of a person of whom the police have a reasonable and articulable suspicion. We note, as a preliminary consideration, that the constitutional parameters of an investigatory detention are not defined by the location of the encounter.[9] Nevertheless, we recognize that fourth amendment analysis may be affected by contextual circumstances. In particular, the risk of harm to a police officer indeed may depend on context, particularly with respect to the threat posed by persons within the vicinity of a suspect. For example, the United States Court of Appeals for the Second Circuit has recognized that "while it is obviously reasonable to believe that individuals in a private home or vehicle have some connection with one another, it is not reasonable to assume that all of the persons at a public bar have such a connection." *United States* v. *Jaramillo*, 25 F.3d 1146, 1152 (2d Cir. 1994).

As for on-the-street encounters, the United States Supreme Court evaluated the safety concerns in *Terry* as follows: "Certainly it would be unreasonable to

---

[9] For example, in regard to investigatory stops, the United States Supreme Court's reasoning in *Terry* v. *Ohio*, supra, 392 U.S. 21, which concerned an on-the-street encounter, was extended to traffic stops shortly thereafter. See, e.g., *United States* v. *Brignoni-Ponce*, 422 U.S. 873, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975). Likewise, in relation to suspicionless detentions, the court has applied the reasoning from the traffic stop context in the search warrant context and vice versa. See respectively, e.g., *Muehler* v. *Mena*, supra, 544 U.S. 99–100; *Arizona* v. *Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009).

require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives." *Terry* v. *Ohio*, supra, 392 U.S. 23–24. Consequently, the court concluded that officers may conduct investigative stops based on reasonable suspicion that an individual is engaged in criminal activity. Id., 27. Additionally, officers permissibly may frisk a suspect if the officer has a reasonable suspicion that the suspect is "armed and dangerous" and "where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety . . . ." Id., 30.

The defendant argues that the danger from a concealed weapon or an ambush is diminished on the street and, therefore, that the *Terry* standard of reasonable suspicion, which was formulated directly in regard to an on-the-street encounter, represents the minimum that was required to justify his seizure. Confining ourselves to the particular circumstances of the defendant's momentary seizure, however, the indices of risk to the officers were similar to those cited in *Maryland* v. *Wilson*, supra, 519 U.S. 413–14, and *Michigan* v. *Summers*, supra, 452 U.S. 702–703, to justify suspicionless detentions during a traffic stop and the execution of a search warrant. Believing Burgos to be Gomez, the officers had a reasonable suspicion that he was armed. They also reasonably could infer that Burgos had the mindset to elude capture in light of the information that he sometimes disguised himself to avoid being arrested on his outstanding warrant. Additionally, the encounter occurred near a location known for drug dealing. Under these circumstances, there was a real danger that the defendant, whom the officers observed walking and

talking with Burgos, would interfere with their investigation in a manner protective of Burgos and potentially harmful to the officers. With the defendant undetained, the officers reasonably could have believed that they were vulnerable to attack from him. In light of the foregoing, the risk to the officers was significant.

The encounter presently at issue also was similar to a traffic stop or execution of a search warrant in its minimal degree of intrusion on the defendant's personal liberty. In confronting Burgos, the officers could not avoid confronting the defendant as well, whom they reasonably could have believed would also be affected by the show of authority directed at Burgos.[10] Consequently, the fact that the officers directed the defendant's movement was merely an incremental inconvenience, much like ordering passengers of a car to wait outside during the completion of a traffic stop. See, e.g., *Maryland* v. *Wilson*, supra, 519 U.S. 413–14 ("[A]s a practical matter, the passengers are already stopped by virtue of the stop of the vehicle. The only change in their circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car."). Furthermore, momentarily directing the defendant's movement was not as intrusive as a frisk or a physical constraint. See, e.g., *Terry* v. *Ohio*, supra, 392 U.S. 27 (to proceed from stop to frisk, officer must reasonably suspect that

---

[10] As a consequence of the "greater protection" against seizure that our Supreme Court recognized in *State* v. *Oquendo*, supra, 223 Conn. 649, the police, by a show of authority, might seize not only the legitimate suspect but also anyone else who happens to be in the suspect's vicinity and who reasonably could believe that the show of authority is directed at him or her. Hypothetically, an officer could try to particularize the show of authority to avoid seizing a suspect's companions, e.g., saying, "stop, man in the red sweater!" instead of simply saying, "stop!" It seems unrealistic, however, to suggest that the police would be able to make such nice distinctions in situations, such as the present one, that require quick action in the interest of public safety.

person stopped is armed and dangerous). Finally, we note that the officers did not approach the men on the basis of an inchoate hunch; see id.; such as would raise the specter of harassment or profiling, but, rather, had a reasonable and articulable suspicion of Burgos, which occasioned the need to detain the defendant.

On balance, therefore, the interest in the officers' safety during the investigatory stop of Burgos outweighed the defendant's personal liberty interest in not being inconvenienced. To mitigate the risk of harm, the officers exercised command of the entire scene, including the defendant. See, e.g., *Michigan* v. *Summers*, supra, 452 U.S. 702–703. When making a "split second" decision, an officer is "not required to calculate the probability that the defendant would proceed in a certain way before taking reasonable steps to protect himself and his fellow officers." *State* v. *Mann*, supra, 271 Conn. 328. For example, when making a suspicionless detention of a passenger during a traffic stop, a police officer "surely [is] not constitutionally required to give [the defendant] an opportunity to depart the scene after he exited the vehicle without first ensuring that, in so doing, she [is] not permitting a dangerous person to get behind her." *Arizona* v. *Johnson*, 555 U.S. 323, 334, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009). Similarly, for example, in determining the reasonable duration of an investigative stop, a court "should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *United States* v. *Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985). The risk in the present case was significant and the incremental intrusion was minimal. We conclude, therefore, that the officers made a lawful investigatory stop of the defendant under the facts of this case.[11]

---

[11] In so concluding, we are not suggesting that it is constitutionally permissible to invade an individual's personal liberty solely on the basis of his

## II

The defendant also claims that the trial court improperly allocated the burden of proof to him in the evidentiary hearing on his motion to suppress. We do not agree.

"[A] search [or seizure] conducted without a warrant issued upon probable cause is per se unreasonable . . .

---

proximity to or association with a suspect. See *State* v. *Rodriguez*, 11 Conn. App. 140, 149, 525 A.2d 1384 (1987). Although we are persuaded by opinions from other jurisdictions approving limited suspicionless detentions and frisks in the interest of officer safety; see, e.g., *United States* v. *Berryhill*, 445 F.2d 1189, 1193 (9th Cir. 1971) (establishing "automatic companion rule" permitting frisk of all companions of arrestee within immediate vicinity who are capable of accomplishing harmful assault on officer); *Trice* v. *United States*, 849 A.2d 1002, 1009 (D.C. 2004) (narrowly endorsing suspicionless frisk based on exigent safety concerns); *People* v. *Smith*, 13 P.3d 300, 306–307 (Colo. 2000) (reasonable for officer to conduct protective search of companion of suspect who apparently intended to interfere with investigation), cert. denied, 531 U.S. 1148, 121 S. Ct. 1088, 148 L. Ed. 2d 963 (2001); *Commonwealth* v. *Fraser*, 410 Mass. 541, 544 n.4, 573 N.E.2d 979 (1991) (suspicionless detention was reasonable where report of armed man in high crime area); *People* v. *Garner*, 50 Ill. App. 3d 294, 296, 365 N.E.2d 595 (1977) (although officer may not search companion of arrestee simply because of their association, officer may frisk companion for safety reasons); we are aware, as well, that policy considerations prohibiting the inference of guilt by association may outweigh an officer's safety concerns at times. See, e.g., *United States* v. *Wheeler*, 800 F.2d 100, 103 (7th Cir. 1986) (simply being in company of suspect is not justification for frisk); *United States* v. *Bell*, 762 F.2d 495, 499 (6th Cir. 1985) (rejecting *Berryhill*'s "automatic companion rule"); *State* v. *Doughty*, 148 Wn. App. 585, 589, 201 P.3d 342 (2009) (stop requires more than simple presence in high crime area or physical proximity to suspected drug dealer); *People* v. *Terrell*, 185 App. Div. 2d 906, 907–908, 587 N.Y.S.2d 8 (1992) (person may not be stopped and frisked solely because he is in company of suspect).

As the United States Supreme Court has emphasized, "a person's mere propinquity to others independently suspected of criminal activity does not, *without more*, give rise to probable cause to search that person" or reasonable suspicion for a frisk. (Emphasis added.) *Ybarra* v. *Illinois*, 444 U.S. 85, 91, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979); see also *Sibron* v. *New York*, 392 U.S. 40, 62–63, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968). Having considered the relevant precedents, we conclude that the present case is reconcilable with *Ybarra* and like precedents because the defendant's association with Burgos was not the sole justification for the stop.

subject only to a few specifically established and well-delineated exceptions. . . . These exceptions have been jealously and carefully drawn . . . and the burden is on the state to establish the exception." (Internal quotation marks omitted.) *State* v. *Johnson*, 286 Conn. 427, 434, 944 A.2d 297, cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d 144 (2008). "When a party contests the burden of proof applied by the court, the standard of review is de novo because the matter is a question of law." (Internal quotation marks omitted.) *State* v. *Petaway*, 107 Conn. App. 730, 744, 946 A.2d 906, cert. denied, 289 Conn. 926, 958 A.2d 162 (2008).

Our review reveals that the defendant's claim is at odds with the record. Although the court incorrectly suggested at the outset of the hearing that the defendant bore the ultimate burden of proof on his motion, it noted that the state had "taken on the burden of going forward [with evidence]." Additionally, in response to this court's order to articulate what burden of proof it applied and to whom the burden was allocated, the trial court articulated: "The state bore—and successfully met—the burden of proving that its warrantless actions were justified." Consequently, we conclude that the court properly allocated the burdens of production and persuasion,[12] respectively, to the state, and the defendant's claim must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[12] See *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 241 n.36, 828 A.2d 64 (2003) (distinguishing burdens of production and persuasion).